(HEALEY v. PLAYLAND AMUSE-
MENTS, Inc.

No. 17469.

Court of Appeal of Louisiana. Orleans.

Jan. 27, 1941.

Rehearing Denied March 10, 1941.

Spearing, McClendon & McCabe, of New Orleans, for appellant.

Yarrut & Stich and Bert Flanders, all of New Orleans, for appellee.

## WESTERFIELD, Judge.

This is a suit by Charles S. Healey for damages in the sum of $4,000 for assault and battery alleged to have been committed upon his person by agents of the defendant, Playland Amusements, Inc. The defendant denied responsibility upon the ground that the plaintiff was the aggressor and upon the further ground that the party who struck plaintiff was not acting within the scope of his employment.

There was judgment below in favor of plaintiff in the sum of $1,000 and defendant has appealed. Plaintiff has answered the appeal and asks that the damages be increased to the amount prayed for.

The defendant corporation operates what is called an amusement concession at Pont-chartrain Beach and referred to in the testimony as "Laff-in-the-Dark". Defendant's counsel, however, describes his client's business as "Laugh-and-Ride" which he says is "a museum containing various weird animated exhibits, called 'stunts' (such as a devil, a dragon, and a skeleton) intended to startle but not really alarm patrons, who ride through the museum seated in small cars running on a miniature electric tramway. The building was kept in total darkness except that lights automatically illuminated each stunt as a car approached—and after the car passed the lights were extinguished. Partitions were so arranged that lights at one stunt would not illuminate other parts of the building". For convenience we will adopt the euphemism of counsel and refer to defendant's establishment as a "museum".

On the evening of June 20th, 1939, the plaintiff, a twenty-two year old dental student of Loyola University, in company with his father and mother, his young sister, Dorothy, and her friend and guest, June Sapienza from Birmingham, Alabama, went to Pontchartrain Beach. Young Healey bought three tickets to the "museum" and he and the two girls attempted to enter one of the cars in which the patrons are transported. They were told that only two persons could ride in one car so Dorothy and June entered the first car and the plaintiff the next one. They had passed several of the "stunts" and as they approached one known as the "Devil" a flashlight was thrown in young Healey's face. When he attempted to grab the flashlight or knock it away he was struck from behind, and pulled out of the car, which was knocked off the track by the violence of Healey's assailants. Two men seized Healey, one on each side of him. In struggling with his captors in complete darkness, the derailment of the car having blown a fuse and extinguished whatever light there was, he struck one of them in the mouth, but was finally subdued and with one man holding each arm he was escorted from the building through a door in the rear of the structure to a storeroom or office maintained by the defendant corporation, where he was forced into a chair and struck in the face by one man and as he attempted to arise from the chair by another.

Richard J. Batt, the secretary-treasurer of defendant corporation, who was in the office at the time Healey was brought in, did not witness the assault because he had

gone in search of a police officer. When Batt returned with the officer Healey was taken out of the storeroom by the officer. As they walked along, they were met by Dr. and Mrs. Healey, who had become very much worried over the failure of Charles to return with the girls and had made a search for him in the building and about its environment in an effort to locate their son.

The defendant in explanation of the occurrence offered testimony to the effect that several nights before Healey visited their place of business their property had been damaged by acts of vandalism apparently committed by patrons of the establishment. The two men who grabbed Healey out of the car when it reached the "Devil" were placed there for the purpose of preventing further depredation and these men, William Wagnon and Frank Kramer, say that as Healey neared the "Devil" he leaned forward out of his seat with his arm extended in front of him and that they concluded that he meant to do some harm to the "Devil". Healey says that he had his arm in front of his face protecting his eyes, but that he did not lean forward in a menacing attitude towards the "Devil". It appears that one of the "stunts" through which the customers passed consisted of a number of strings or threads which brushed against their faces. It was to prevent any other strings from possibly injuring his eyes that young Healey, according to his statement, placed his arm in front of his face.

Defendant's counsel deny that Healey was hit more than once while in the storeroom. However, Kramer, who had removed Healey from the "museum" testified that he struck him when he was seated in the chair in the storeroom because, he felt some blood trickling down from his mouth as a result of the blow he received while in the "museum" and because he was afraid that Healey was going to hit him again and James Duffy, another employee of the defendant, says that he also hit Healey while he was in the storeroom because, "I thought he was going to hit me".

Healey states that he was rendered unconscious from the blows received in the storeroom but he is uncorroborated by any of the witnesses except Kramer, who admits that while Healey was sitting down he struck him as hard as he could and knocked him dizzy.

It is said that Healey was a strong young man, six foot two inches tall, weighing one hundred and sixty pounds, whereas the employees of the defendant were small men about five and one-half feet tall and with little physical strength and that they were, therefore, incapable of doing much harm with their fists. In normal health, Healey, who was much taller than his assailants, was, no doubt, quite robust, but he had barely recuperated from a spell of illness. Moreover, he was taken in custody by two men who, whatever their physical condition, succeeded in overpowering the struggling young man and, according to their own statement, forced him to accompany them to their employer's office very much against his will. Counsel say that Healey was the aggressor and cannot recover damages as a result of the difficulty which he provoked. Oakes v. H. Weil Baking Company, 174 La. 770, 141 So. 456; Russo v. Orpheum Theatre & Realty Co., 136 La. 24, 66 So. 385, L.R.A.1915B, 1119; Jumonville v. Frey's, Inc., La.App., 173 So. 227.

█ But Healey was not the aggressor. He was a patron of defendant, quietly seated in its moving car in the darkened building, seeking the amusement afforded by the various "stunts" when a flashlight was thrust out of the darkness into his face. Such an experience was well calculated to startle anyone in those surroundings and it was quite natural for him to attempt to knock the flashlight out of his face and to repel the assault by force, particularly after having been struck in the back of the neck.

Healey's captors doubtless thought that they had discovered some one who was about to damage their employer's property, perhaps one of the miscreants that had been committing the acts of vandalism. It may be that the position of Healey's arm had something to do with convincing them that he intended some mischief. He was in his shirt sleeves and hatless, which we are informed by the record and by our own observation, is not an unusual attire for college students. Nevertheless, he was very neatly clothed and there was nothing to indicate that he was not thoroughly respectable. There is nothing whatever to justify the belief that Healey intended any harm to defendant's property and if defendant's agents thought otherwise their action was, to say the least, precipitate. It would have been more prudent and more consistent with

the respect for their employer's patrons to await some overt act such as a blow aimed at the "Devil" for instance, before seizing upon one of defendant's patrons.

Counsel say, however, that the defendant is not liable because the assault upon young Healey, though committed by the defendant's agents, was beyond the scope of their authority. We are referred to Williams v. Pullman Car Company, 40 La.Ann. 87, at page 91, 3 So. 631, at page 634, 8 Am. St.Rep. 512, from which the following is quoted: " 'The test of the master's responsibility,' says Cooley, 'is not the motive of the servant, but whether that which he did was something which his employment contemplated, and something which, if he should do it lawfully, he might do in the employer's name.' Cooley, Torts, [p.] 536."

Article 2320 of the Revised Civil Code declares that the master is responsible for their servant's conduct, "in the exercise of the functions in which they are employed."

There can be no question but what Wagnon and Kramer were acting within the scope of their employer's business in the apprehension of Healey in the "museum". They were placed there by defendant for the purpose of removing "unruly" persons and bringing them to the office of their employer. Mr. Batt, secretary-treasurer of the defendant corporation, so testified. Whatever force was necessary for the accomplishment of this purpose was in furtherance of the business of the master. On this point there is no contention. But, it is said, that when Kramer struck Healey in the jaw in the storeroom and knocked him "dizzy", he was acting on his own responsibility in retaliation for the blow which he had received in the "museum" and not in the discharge of any duty in connection with his employment. Ware v. Barataria & La Fourche Canal Co., 15 La. 169, 35 Am.Dec. 189; Dyer v. Rieley et al., 28 La. Ann. 6; Candiff v. Louisville, N. O. & T. Railroad Co., 42 La.Ann. 477, 7 So. 601; Lafitte v. New Orleans C. L. Railway Co., 43 La.Ann. 34, 8 So. 701, 12 L.R.A. 337; McDermott v. American Brewing Co., 105 La. 124, 29 So. 498, 52 L.R.A. 684, 83 Am. St.Rep. 225; Godchaux v. Texas & P. Railroad, 144 La. 1041, 81 So. 706; Valley v. Clay, 151 La. 710, 92 So. 308, and Comfort v. Hotel Monteleone, 163 So. 670.

In the first place, Kramer insists that his only reason for striking Healey while he was seated in the chair in the storeroom was because "I thought he was going to strike me again and that is the reason why I struck him". At the time the blow was struck Healey was being held in the chair by Kramer on the left side and Wagnon on the right side, and, according to Kramer, he had to release his hold in order to strike him. There would not appear to be any reasonable ground for Kramer believing that Healey intended to strike him while he was seated in the chair.

In our opinion, both Wagnon and Kramer, as well as Duffy, were determined to keep Healey in the chair while their employer, Batt, went to get a police officer. Duffy says that he struck him as he attempted to arise from the chair. It seems to us, therefore, that all three men were acting within the scope of their employer's instructions, which were to bring persons whom they regarded as unruly to the office and storeroom and to detain them until their employer had either caused their arrest or dismissed them. Batt, of course, realized that a mistake had been made and did not prefer charges against young Healey. On the contrary, he was quite apologetic when Healey's father indignantly demanded to know who had struck his son. We believe that for everything that happened to young Healey, defendant is liable. This is not a case of an employee stepping aside and venting personal vengeance as was the situation in Comfort v. Hotel Monteleone, supra, where we held that the "employee plainly was acting solely in the venting of his own personal spite". The force which was used in this instance was deemed necessary in order to keep young Healey in the chair until Batt returned and, we believe, that it was all exerted in the furtherance of the instructions of the master.

The lower court awarded $1,000 to plaintiff for all items of damage claimed which, in the petition, are set forth as follows:

"(1) For mental anguish, suffering and humiliation.

"(2) For physical suffering and permanency of pains in his head.

"(3) For inability for several weeks properly to masticate food.

"(4) For false arrest and unlawful detention."

Defendant's counsel earnestly contend that the amount is "shockingly excessive".

A number of cases are cited involving similar incidents where the awards have been much less. Fontenelle v. Waguespack, 150 La. 316, 90 So. 662; Clark v. Bisso, 145 La. 989, 83 So. 216; Brennan v. Hardy, La.App., 172 So. 541.

It is also contended that in this case the agents of the defendant had been provoked and, consequently, that fact should be considered in mitigation of damages. Harvey v. Harvey, 124 La. 595, 50 So. 592; Quinn v. Banker, La.App., 166 So. 908; La Fleur v. Dupre, 1 La.App. 230; Deroeun v. Fontenot, 8 La.App. 652; Jumonville v. Frey's, Inc., La.App., 173 So. 227; and Oakes v. H. Weil Baking Co., supra.

 We fail to see how the plaintiff can be regarded as having given any provocation. It is said that he assumed a belligerent attitude and "boasted that he had struck Kramer and needlessly made the most inflammatory and provocative threat that he would do it again". In view of what had happened and the way that he had been treated Healey could have assumed only one of two attitudes— that of belligerency and defiance or that of submission and dejection. Being a young man of spirit he naturally resented the rough treatment which, so far as he could see, was without rhyme or reason. He regarded the attack as wanton and malicious and resented it. It was too much to expect that Healey would submit quietly to the provocative acts of his captors. The blow received by Healey caused a spot to appear on his face and a soreness in his jaw which lasted for several days. The physical damage was not severe, but it was a most humiliating experience for which we think substantial damages should be awarded. However, $1,000, which the trial court awarded, is too much and should be reduced, we believe, to $750.

For the reasons assigned the judgment appealed from is amended by reducing the amount awarded to $750, and as thus amended it is affirmed. Costs of appeal to be paid by plaintiff-appellee.

Amended.